UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| BEKA PRESTON, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. V-09-20 |
| | § | |
| VICTORIA INDEPENDENT SCHOOL | § | |
| DISTRICT, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION & ORDER

Pending before the Court is Defendant Victoria Independent School District's (VISD) Motion for Summary Judgment (Dkt. No. 9), to which Plaintiff Beka Preston ("Preston") has responded (Dkt. No. 13). Having considered the motion, response, record, and applicable law, the Court is of the opinion that VISD's motion should be **GRANTED**.

## I.  Background

Preston began working for VISD in 1999, teaching sixth grade social studies at Crain Middle School ("Crain"). In December 2001, Preston was moved to a classroom in a new building on the Crain campus. Shortly thereafter Preston became ill, and in early 2002 she was diagnosed with fibromyalgia. Despite her health problems, Preston continued teaching at Crain for the next three years without incident.

In August 2005, Preston returned to Crain following summer recess in order to prepare her classroom for the upcoming school year. When janitors opened the door to her classroom, Preston discovered mold growing inside. According to Ramiro Rubio, who was VISD's environmental risk manager at the time, the air conditioner in Preston's classroom malfunctioned sometime that summer, causing water to leak into the room. The water, combined with hot air

from the air conditioner and the Texas summer heat, allowed mold to grow. After the mold was removed and the room was cleaned, the Texas Department of Health and Safety inspected the room and determined it was a safe environment. VISD Principal Lisa Blundell nonetheless gave Preston the choice of either returning to her old classroom or relocating to a new room. Preston chose to move to a new room and was reassigned to a room in another building on the Crain campus.

During the fall of 2005, Preston began complaining to Crain administrators that she was being bullied by Assistant Principal Yolanda Torres. Around the same time, Preston also sought help from Vidal Guevara, a licensed professional counselor employed by Victoria Counseling Services, in order to cope with the stress of being bullied by Ms. Torres. In response to Preston's complaints, Ms. Blundell instructed Ms. Torres to act professionally and limit her contact with Preston, and she removed Ms. Torres as Preston's appraiser.

Preston also complained to Eloy Chapa, VISD Director of Human Resources, numerous times throughout the fall of 2005, stating that she was experiencing stress due to her relationship with Ms. Torres. In December 2005, Preston told Chapa that she believed a transfer to another campus would be the best solution to her conflicts at Crain and requested information regarding an opening in the science department at Howell Middle School ("Howell"), another school within the VISD system. Mr. Chapa contacted Howell Principal Debbie Crick on Preston's behalf and also put Preston directly in touch with Ms. Crick. However, Ms. Crick informed Preston that she could not hire her for the position because she was not certified to teach science at that grade level.

The following month, Mr. Guevara referred Preston to a psychiatrist, Dr. George Constant. Dr. Constant diagnosed Preston with recurrent Post Traumatic Stress Disorder (PTSD)

coupled with severe depression and informed VISD that Preston needed to be excused from work for roughly four to six weeks in order to recover from this illness. Preston told Ms. Blundell, Mr. Chapa, and VISD payroll supervisor Ruby Jimenez that her health problems stemmed from stress related to the conflict between Ms. Torres and herself. As a result, Preston began taking leave under various VISD policies in January 2006.

While Preston was on leave, she continued to communicate with Mr. Chapa regarding what VISD could do to enable her to return to work. On January 27, 2006, Preston sent Mr. Chapa an email stating that she could not return to work until conflict resolution between herself and Ms. Torres had taken place. The following week, Preston sent Mr. Chapa another email stating that if Ms. Torres could be removed from any contact with her, she could possibly return to work. Roughly one week later, Mr. Chapa held a conference with Preston, Ms. Blundell, and Mr. Guevara in order to address Preston's concerns regarding Ms. Torres. Mr. Chapa explicitly asked Preston what VISD could do to help her return to her teaching position at Crain, to which Preston responded that VISD could: (1) conduct a campus-wide survey concerning bullying and harassment; (2) remove Ms. Torres as assistant principal; (3) pay Preston the full remainder of her contract; (4) while Preston was on leave, deduct the cost of a substitute from Ms. Torres' salary; or (5) take no action against Preston's teaching credentials or certification.  VISD did not do any of these things.

At some point in March 2006, Preston was medically cleared to return to work. Preston returned to teaching at Crain for approximately one week, until she had another encounter with Ms. Torres. Preston emailed Mr. Chapa to complain about Ms. Torres and went on leave again. Shortly thereafter, Dr. Constant sent another letter to VISD stating that Preston was still under his care for PTSD and depression and would need to be excused from work in order to recover

from this illness. Preston did not return to work during the remainder of the 2005—06 school year.

On June 19, 2006, while school was recessed for summer vacation, Preston emailed Mr. Chapa and asked to be placed on the transfer list, which would give her the opportunity to transfer to a different campus within the VISD system. The principal at Mitchell Guidance Center ("Mitchell") offered Preston a position teaching special education at Mitchell, but Preston declined the position because she heard from another teacher that it was "the highest stress job in VISD."

Although VISD renewed Preston's contract for the 2006—07 school year and placed her on the master schedule, Preston did not report to work when school reconvened on August 14, 2006. In an August 15, 2006 letter, Dr. Constant notified VISD that Preston was still under his care for PTSD/depression. The letter also stated that Preston had requested his permission to return to work, but her condition precluded it at that time. Instead of returning to work, Preston was granted 10 days of paid state and local leave under her contract.

On October 23, 2006, Mr. Chapa called Preston to inform her that she had exhausted all available leave and needed to return to work.[1] In an email dated November 1, 2006, Preston informed Mr. Chapa that she was unable to return to the Crain campus as long as Ms. Torres was still there, but that she was very interested in a position at another school. In response, Mr. Chapa held a conference with Preston and Ms. Jimenez. In that meeting, Mr. Chapa reiterated that

---

1. Specifically, Preston had exhausted 10 paid days of state and local leave under her 2005—06 contract, and then exhausted 40 days of Extended Leave. Next, Preston requested and was granted 28 days of Catastrophic Leave. Both Extended Leave and Catastrophic leave are paid leave under VISD policies; however, the employee's pay is docked at the rate of a substitute teacher. At the same time, Preston was also granted 12 weeks leave under the Family Medical Leave Act (FMLA), beginning January 30, 2006, which ran concurrently with her Extended and Catastrophic leave. After she had exhausted this leave, including leave under the FMLA, Preston then requested and was granted 36 weeks Temporary Disability Leave, which runs on calendar days including the summer. Finally, Preston exhausted all remaining state and local leave under her 2006—07 contract when she failed to return to work in September 2006.

4

because Preston had exhausted all available leave, and had informed VISD that she was under a doctor's care and unable to return to work, then he had no choice but to recommend that VISD terminate her contract. Preston still did not return to work.

On December 7, 2006, VISD Superintendent Bob Moore sent Preston a letter stating that he was going to recommend to the Board of Trustees ("the Board") that Preston be terminated for good cause. In response, Preston sent Mr. Chapa an email on December 12, 2006, stating that although her doctor had not released her to return to work on the Crain campus "because of medical problems possibly related to exposure to severe black mold infestation I occupied for a number of years and because of traumatic stress I endured at the hands of a verbally abusive and disrespectful assistant principal," she had not communicated that she was unable to return to work. On the contrary, she was willing to pursue a number of positions on other VISD campuses. Later that same day, Preston sent Mr. Chapa another email stating that she had been in contact with the Southwest Americans with Disabilities Act (ADA) Center and felt that she had been discriminated against by VISD. Preston further informed Mr. Chapa that unless he reconsidered her request to transfer to another campus, she would be forced to take action regarding VISD's threat to terminate her contract and refusal to consider her many requests for a reasonable accommodation under the ADA. On December 14, 2006, the Board voted to give Preston notice of proposed intent to terminate her contract. Board President Bernard Klimist sent Preston a letter notifying her of the Board's decision the following day.

On March 5—7, 2007, a hearing was held under the auspices of the Texas Education Agency (TEA) regarding the Board's notice of intent to terminate Preston's contract.[2] At that hearing, Preston testified that her PTSD was caused by the traumatic event of discovering mold

---

2.  All references to Tr. in this Order are to the transcript of the TEA hearing, which VISD attached as Exhibit 1 to its Motion for Summary Judgment (Dkt. No. 9).

growing in her classroom in August 2005 and her subsequent realization that the mold may have caused her fibromyalgia. Preston further testified that her PTSD was a disability under the ADA, and that VISD could not lawfully terminate her, but instead was required to transfer her to another campus as a reasonable accommodation for her disability. VISD took the position that Preston was not disabled, and that her only reason for taking leave from work was her conflict with Ms. Torres. The hearing examiner sided with VISD and on April 19, 2007, the Board adopted his findings of fact and conclusions of law, and voted to terminate Preston for good cause.  Preston filed the instant action on March 27, 2009, alleging that VISD discriminated against her in violation of the ADA.

## II.  Standard of Review

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Christopher Village, LP v. Retsinas*, 190 F.3d 310, 314 (5th Cir. 1999). "For any matter on which the non-movant would bear the burden of proof at trial . . . , the movant may merely point to the absence of evidence and thereby shift to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial." *Transamerica Ins. Co. v. Avenell*, 66 F.3d 715, 718—19 (5th Cir. 1995); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323—25 (1986). To prevent summary judgment, the non-movant must "respond by setting forth specific facts" that indicate a genuine issue of material fact. *Rushing v. Kansas City S. Ry. Co.*, 185 F.3d 496, 505 (5th Cir. 1999).

When considering a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in favor of the

non-movant. *See Samuel v. Holmes*, 138 F.3d 173, 176 (5th Cir. 1998); *Texas v. Thompson*, 70 F.3d 390, 392 (5th Cir. 1995). "The court may not undertake to evaluate the credibility of the witnesses, weigh the evidence, or resolve factual disputes; so long as the evidence in the record is such that a reasonable jury drawing all inferences in favor of the nonmoving party could arrive at a verdict in that party's favor, the court must deny the motion." *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263 (5th Cir. 1991). However, the non-movant cannot avoid summary judgment by presenting only "conclusory allegations" or "unsubstantiated assertions," such as the bare allegations of a complaint, but must present sufficient evidence, such as sworn testimony in a deposition or affidavit, to create a genuine issue of material fact as to the claim asserted. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). "Even if the standards of Rule 56 are met, a court has discretion to deny a motion for summary judgment if it believes that 'the better course would be to proceed to a full trial.'" *Freeman v. U.S.*, 2005 WL 3132185, *2 (S.D. Tex. Nov. 22, 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

## III.  Discussion

The Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.*, "prohibits an employer from discriminating against an 'individual with a disability' who, with 'reasonable accommodation,' can perform the essential functions of the job." *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 393 (2002) (citing 42 U.S.C. §§ 12112(a) and (b)). VISD moves for summary judgment on the grounds that Preston is not a qualified "individual with a disability" under the ADA, and even assuming she is, VISD reasonably accommodated her. Preston contends summary judgment is inappropriate because genuine issues of material fact exist regarding

7

whether she is a qualified individual with a disability as defined by the ADA and whether VISD

failed to follow its own internal policies in dealing with her disability.

### A.  Preston's *Prima Facie* Case of Discrimination

Under the familiar *McDonnell Douglas* framework, Preston must first establish a *prima

facie* case of discrimination by showing: (1) she suffers from a disability as defined by the ADA;

(2) she was qualified for her job; (3) she experienced an adverse employment action because of

her disability; and (4) VISD replaced her with or treated her less favorably than a non-disabled

employee.  *Gowesky v. Singing River Hosp. Sys.*, 321 F.3d 503, 511 (5th Cir. 2003); *see also*

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  Once Preston establishes her

*prima facie* case, the burden shifts to VISD to articulate a legitimate, non-discriminatory reason

for the adverse employment action. *Id.* Once VISD articulates such a reason, the burden shifts

back to Preston to show by a preponderance of the evidence that the reason was (1) merely a

pretext for unlawful discrimination, or (2) only one of the reasons for VISD's actions and that

another motivating factor was Preston's disability.  *See Id.*; *Rachid v. Jack in the Box, Inc.*, 376

F.3d 305, 312 (5th Cir. 2004).

### 1.  Is Preston Disabled Under the ADA?

The threshold issue in Preston's *prima facie* case is a showing that she suffers from a

disability protected by the ADA. *See Hamilton v. Southwestern Bell Telephone Co.*, 136 F.3d

1047, 1050 (5th Cir. 1998); *Bridges v. City of Bossier*, 92 F.3d 329, 332 (5th Cir. 1996). A

plaintiff is "disabled" under the ADA if she: (1) has a physical or mental impairment that

substantially limits one or more of her major life activities; (2) has a record of such an

impairment; or (3) is regarded by her employer as having such an impairment. 42 U.S.C. §

12102(1).

8

To have a "record of impairment," Preston must either have "a history of" an impairment that substantially limits one or more major life activities or she must have "been misclassified as having" the same. 29 C.F.R. § 1630.2(k). A person is "regarded as" disabled if she (1) has an impairment that is not substantially limiting but that her employer perceives as being substantially limiting; (2) has an impairment that is substantially limiting only because of the attitudes of others toward such an impairment; or (3) has no impairment at all but is regarded by the employer as having a substantially limiting impairment. *McInnis v. Alamo Cmty. Coll. Dist.*, 207 F.3d 276, 281 (5th Cir. 2000); *Bridges v. City of Bossier*, 92 F. 3d 329, 332 (5th Cir. 1996); *see also* 29 C.F.R. § 1630.2(l). Preston does not claim that VISD regarded her or misclassified her as having a physical or mental impairment that substantially limits one or more of her major life activities. Instead, Preston contends that she has a substantially limiting impairment, and she is therefore an individual with a disability as defined by 42 U.S.C. § 12102(1)(A).

Preston has offered evidence that she suffered from PTSD coupled with depression. (Letters from Dr. Constant to VISD, Dkt. No. 13, Exs. J, K, & L.) While PTSD may constitute a mental disability under the ADA, it is not a disability *per se*. *Hamilton*, 136 F.3d at 1050. To be disabled within the meaning of the ADA, Preston must demonstrate her impairment "substantially limited" one or more major life activities. *Id.*; 42 U.S.C. § 12102(2); *see also Ivy v. Jones*, 192 F.3d 514, 516 (5th Cir. 1999) ("The particularized inquiry mandated by the ADA centers on *substantial limitation of major life activities, not mere impairment*.") (emphasis added).

An individual is "substantially limited" if he or she is:

(i) Unable to perform a major life activity that the average person in the general population can perform; or (ii) Significantly restricted as to the condition, manner, or duration under which [he or she] can perform a particular major life activity as

9

compared to the condition, manner, or duration under which the average person in
the general population can perform that same major life activity.

29 C.F.R. § 1630.2(j)(1).

"Major life activities" include, but are not limited to, "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C.A. § 12102(2)(A). In determining whether an individual's impairment substantially limits a major life activity, courts should consider the following factors: "(i) The nature and severity of the impairment, (ii) The duration or expected duration of the impairment; and (iii) The permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." 29 C.F.R. § 1630.2(j)(2).

Preston claims that her PTSD/depression severely affected her ability to perform the major life activities of "sleeping, working, caring for oneself, interacting with others, thinking and performing manual tasks." (Dkt. No. 13 at 4.)

### a. Working

With regard to working,

[S]ubstantially limits means significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.

29 C.F.R. § 1630.2(j)(3)(i). While the Fifth Circuit "has little precedent giving examples of what constitutes a 'class of jobs,' . . . [t]he Supreme Court has summarized these considerations by saying: 'If jobs utilizing an individual's skills (but perhaps not his or her unique talents) are available, one is not precluded from a substantial class of jobs. Similarly, if a host of different types of jobs are available, one is not precluded from a broad range of jobs.'" *Tullos v. City of*

*Nassau Bay*, 137 Fed.Appx. 638, 648 (5th Cir. 2005) (quoting *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 492 (1999) (superseded on other grounds by the 2008 amendments to the ADA)).[3]

The Fifth Circuit recently considered whether an employee's PTSD substantially limited his ability to perform a class of jobs or broad range of jobs. In *Carter v. Ridge*, 255 Fed. Appx. 826 (5th Cir. 2007), Carter, a pilot for the Department of Homeland Security (DHS), was diagnosed with PTSD after he was involved in a near fatal crash while flying a piston-driven airplane. Carter's PTSD was thereafter triggered when he flew piston-driven airplanes, but he was able to fly turbine-driven airplanes without incident. The doctor who performed Carter's fitness-for-duty examination concluded that although Carter was psychologically fit to serve as a pilot, he should not fly piston-driven aircraft. Because Carter was unable fly all types of aircraft specified in his job description, DHS offered him two non-pilot positions, which Carter declined. After Carter was terminated for refusing to accept a directed reassignment, he sued DHS alleging that his PTSD substantially limited his major life activity of working and that he was denied accommodations for his disability.[4] In affirming summary judgment in favor of DHS, the Fifth

---

3. In addition to the factors listed in § 1630.2(j)(2), the Court may also consider the following factors when determining whether an individual is substantially limited in the major life activity of working:

(A) The geographical area to which the individual has reasonable access;

(B) The job from which the individual has been disqualified because of an impairment, and the number and types of jobs utilizing similar training, knowledge, skills, or abilities, within that geographical area, from which the individual is also disqualified because of the impairment (class of jobs); and/or

(C) The job from which the individual has been disqualified because of an impairment, and the number and types of other jobs not utilizing similar training, knowledge, skills, or abilities, within that geographical area, from which the individual is also disqualified because of the impairment (broad range of jobs in various classes).

29 C.F.R. § 1630.2(j)(3)(ii).

4. Carter sued DHS under the Rehabilitation Act, which is the exclusive remedy for federal employees claiming disability discrimination. The Rehabilitation Act adopts the standards applied under the ADA to determine whether there has been a violation. 29 U.S.C. § 794(d).

Circuit found that Carter did not raise a genuine issue of material fact as to whether his PTSD

substantially limited his ability to work.

> A physical or mental impairment that only affects the claimant's ability to engage
> in a narrow range of jobs or a particular job alone "does not substantially limit
> one or more major life activities." . . . Instead, "the impairment must substantially
> limit employment generally." Carter alleges that his PTSD only limits his ability
> to pilot single engine piston driven aircraft and that he remains fully capable of
> flying other types of aircraft. It is not enough for Carter to present evidence that
> he can no longer pilot single engine piston driven aircraft; he must show that he is
> "significantly restricted in ability to perform either a class of jobs or a broad range
> of jobs in various classes." Carter's own argument, acknowledging that he is able
> to pilot other types of aircraft, indicates that he has not met this standard. He has
> not established that his medical condition bars him from working in all jobs
> within the aviation field or from holding a large number of jobs in other
> categories of employment.

*Carter*, 255 Fed. Appx. at 829—30 (internal citations omitted).

Like Carter, Preston claims that she developed PTSD after a traumatic experience at work

and that she is unable to work under conditions that may trigger flashbacks of the initial trauma.

Specifically, Preston claims her PTSD was caused by her discovery of mold growing in her

classroom and subsequent realization that the mold may have caused her to develop

fibromyalgia. Thus, Preston contends her medical condition limits her "ability to perform her

teaching tasks in an environment contaminated by mold or perceived by Ms. Preston to be

contaminated by mold," but she is perfectly capable of "perform[ing] her teaching tasks in a

mold free environment such as another campus." (Dkt. No. 13 at 11.)

According to VISD, Preston's claim that her exposure to mold was a traumatic and

disabling event is mere fabrication. Noting Preston's numerous emails and letters complaining

about Ms. Torres,[5] as well as Preston's own hearing testimony that there was nothing about her

---

5.  *See, e.g.*, Preston's Jan. 27, 2006 email to Chapa, Dkt. No. 13 Ex. W ("Apparently my doctor had sent a
letter to you or Mrs. Gonzales stating that I could not return to work until the conflict resolution had taken place.");
Preston's Feb. 1, 2006 email to Chapa, Tr. Vol. I at 117 ("This just floors me that I have to take a leave of absence
due to continued harassment from [a] supervisor . . . ."); Preston's Feb. 2, 2006 email to Chapa, Tr. Vol. I at 120

PTSD diagnosis that would have prevented her from working on any campus other than a campus Ms. Torres was on (Tr. Vol. III at 165), VISD instead argues that Preston's only "disability" is an aversion to Ms. Torres. VISD further contends that even if Preston did suffer from PTSD caused by her discovery of mold in her classroom, Preston is not disabled because her own testimony shows that she is perfectly capable of working, just not on the Crain campus, and a qualifying disability under the ADA cannot be site-specific.

Preston admits that Ms. Torres was a secondary stimulus that aggravated her PTSD and claims that Ms. Torres' "abrasive personal tactics and ongoing harassment" created additional stress on top of the stress she suffered due to her discovery of the mold. (*Id.* at 12.) However, Preston has offered evidence that her PTSD stemmed primarily from her discovery of mold in her classroom and her belief that mold present at the Crain campus over an extended period of time caused her to develop fibromyalgia. (*See* Letters from Dr. Constant to VISD, Dkt. No. 13, Exs. J, K, & L; Letter from Dr. Constant to Unum, *Id.* Ex. P; Guevara Aff., *Id.*, Ex. B.)  Preston's counselor, Mr. Guevara, also testified that it does not matter whether the mold actually caused her fibromyalgia, or whether Crain is presently infested with mold—as long as Preston holds these beliefs, her PTSD precludes her from teaching on the Crain campus. (Guevara Testimony, Tr. Vol. II at 81.)

Viewing the evidence in the light most favorable to Preston, the Court nonetheless finds that Preston is not disabled under the ADA because, like the plaintiff in *Carter*, Preston's own statements show that she is not "significantly restricted in ability to perform either a class of jobs or a broad range of jobs in various classes." 29 C.F.R. § 1630.2(j)(3)(i). In a December 11, 2006 email to Mr. Chapa, Preston stated, "I have not communicated that I am unable to return to work.

("[I]f [Torres] could be removed from any contact with me . . . I possibly could return to work.");    Preston's Nov. 1, 2006 email to Chapa, Tr. Vol. III at 146 ("I am unable to return to the Crain campus as long as Ms. Torres is still there.").

To the contrary, I have inquired about and have been willing to pursue a number of positions within the district for which I am qualified." (Dkt. No. 13, Ex. H.) Further, Preston was explicitly asked by counsel for VISD, "Are you telling us that if we stopped this whole thing today, and I was able to waive a magic wand or do whatever I needed to do and get you a job at Howell tomorrow, that you could return to work? You're capable of doing that?" Preston replied, "I am capable of doing that." (Tr. Vol. III at 158.) Mr. Guevara also testified that Preston's medical condition and whether or not she could return to work was site specific to the Crain campus. (Tr. Vol. II at 153—54.)

Preston has not established that her medical condition bars her from working in all jobs within the education field or from holding a large number of jobs in other categories of employment. Preston has merely offered evidence that she is unable to hold the job of "classroom teacher at Crain," and, as the Fifth Circuit has repeatedly observed, "an inability to perform one particular job . . . does not constitute an impairment that substantially limits one's ability to work." *Gowesky*, 321 F.3d at 508 (citing 29 C.F.R. § 1630.2(j)(3)(i)); *see also Windly v. Hightower Oil Co., Inc.*, 91 Fed. App'x. 330, 332—33 (5th Cir. 2004) (unpublished); *McClure v. Gen. Motors Corp.*, 75 Fed. App'x. 983, 894 (5th Cir. 2003) (unpublished); *Deas v. River West, L.P.*, 152 F.3d 471, 480—82 (5th Cir. 1998). Thus, the Court concludes that Preston's has failed to raise an issue of material fact as to whether she was substantially impaired in the major life activity of working.

### b.  Sleeping

Preston further contends that she "has presented ample evidence that she suffers from chronic fatigue and sleep anomalies with long-term affects [sic] on the major life activity of sleeping." (Dkt. No. 13 at 4.)

Like Preston, the plaintiff in *Carter v. Ridge* also claimed that his ability to sleep was substantially impaired. *Carter*, 255 Fed. Appx. at 829. The Fifth Circuit found that Carter failed to raise a genuine issue of material fact as to whether PTSD substantially limited his ability to sleep, explaining that "'[s]omeone who sleeps moderately below average is not disabled under the Act.'" *Id.* at 830 (quoting *Nadler v. Harvey*, 2007 WL 2404705, at *6 (11th Cir. Aug. 24, 2007)). "'Difficulty sleeping is extremely widespread, and plaintiff must present evidence, beyond vague assertions of a rough night's sleep or a need for medication, that his affliction is worse than that suffered by a large portion of the nation's adult population.'" *Id.* The court ultimately concluded that while "getting less than five hours of sleep per night . . . establishe[d] that Carter's sleep was limited by his PTSD . . . , it did not establish that he was substantially impaired in the major life activity of sleeping." *Id.* (citing *Nuzum v. Ozark Auto. Distribs.*, 432 F.3d 839, 848 (8th Cir. 2005) (finding that sleeping two and half hours at a time and five hours a night is not substantially impaired); *Swanson v. Univ. of Cincinnati*, 268 F.3d 307, 316 (6th Cir. 2001) ("While less than five hours sleep is not optimal, it is not significantly restricted in comparison to the average person in the general population.")).

According to the affidavit of Dr. Mario Lamothe, Preston was diagnosed with fibromyalgia in 2002, which causes her to experience chronic fatigue and sleep disruption. (Dkt. No. 13, Ex. A.) Mr. Guevara testified that Preston complained to him that she experienced abnormal sleep cycles, such that some nights she would not sleep at all, other nights she would sleep between two and four hours, and still other nights she would sleep between ten and twelve hours. (Tr. Vol. II at 59—60.) Preston has also offered a Polysomnography Report from a sleep study in which she participated in 2003 in order to corroborate her hearing testimony that she often experienced leg jerks and sat up in bed at night. (Dkt. No. 13, Ex. G at 3; Tr. Vol. III at 45.)

15

However, the same report also states that Preston reported feeling like she received between five and eight hours of sleep per night and further indicates that Preston slept for 7.2 of 8.1 hours during the actual sleep study. (Dkt. No. 13, Ex. G at 1—2.) Based on the evidence presented by Preston as well as the standard adopted by the Fifth Circuit in *Carter*, the Court concludes that although Preston's sleep may have been affected by her fibromyalgia and PTSD, she has failed to raise an issue of material fact as to whether she was substantially impaired in the major life activity of sleeping.

### c.   Caring for oneself, interacting with others, thinking, and performing manual tasks

Finally, Preston contends that she was substantially limited in the major life activities of "caring for oneself, interacting with others, thinking and performing manual tasks." (Dkt. No. 13 at 4.) In support of this claim, Preston cites her mother's hearing testimony that Preston had to move in with her because she was unable to take care of herself or her children. (Tr. Vol. III at 109—10.) Preston also cites Mr. Guevara's testimony that Preston's "relationships at the school had changed since she was no longer working," she had lost friends "due to the current situation with the school," she "could no longer read like she used to," and she had been placed on medication for concentration and focus. (Tr. Vol. II at 85—86.)

The Court finds that Preston has undermined her own factual evidence of disability by testifying that she drove herself to the hearing (Tr. Vol. III at 153), dressed herself each morning (*Id.* at 164), and was able to clean her house (*Id.* at 173). Further, the Psychiatric Assessment Form that Dr. Constant and Mr. Guevara completed—which was offered as evidence by Preston—indicates that Preston is able to care for herself and her children (Dkt. No. 13, Ex. Q), and Mr. Guevara explicitly testified during Preston's hearing that "Ms. Preston is an educated person that can take care of herself if she needs to." (Tr. Vol. II at 165.) Preston has failed to

16

present evidence beyond her own conclusory allegations that she is substantially limited in her ability to care for herself, interact with others, think, or perform manual tasks. Moreover, she fails to explain how transferring to another campus would magically cure all of these impairments.

In sum, the Court concludes that Preston has failed to raise an issue of material fact as to whether her PTSD/depression substantially impaired any major life activity.

### 2.   Was Preston "Otherwise Qualified" for Her Job?

Even if Preston could establish that she was disabled under the ADA, she still must show that she was "otherwise qualified" for her job. *Heilweil*, 32 F.3d at 722; *Chiari v. City of League City*, 920 F.2d 311, 315 (5th Cir. 1991); *Leckelt v. Board of Commissioners*, 909 F.2d 820, 827 (5th Cir. 1990). Determining whether Preston was qualified for her job involves a two-prong test. First, the Court must examine whether Preston could perform the "essential functions" of her job. *Chandler v. City of Dallas*, 2 F.3d 1385, 1393—94 (5th Cir. 1993). Second, the Court must determine whether Preston proved that VISD could have made a "reasonable accommodation" to enable her to perform her job. *See id.* The ADA provides that a reasonable accommodation may include:

> (A)   making existing facilities used by employees readily accessible to and useable by individuals with disabilities; and

> (B)   job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training material or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

42 U.S.C. § 12111(9). If Preston is able to demonstrate that an accommodation existed and that such accommodation was reasonable, then VISD "may defend by showing business necessity or undue burden." *See Riel v. Elec. Dada Sys. Corp.*, 99 F.3d 678, 682 (5th Cir. 1996).

Preston claims that she could not perform the essential functions of her job as a classroom teacher on the Crain campus because the flashbacks she had of discovering mold growing in her classroom coupled with the harassment she suffered at the hands of Ms. Torres aggravated her PTSD. Nonetheless, Preston asserts that she could perform the essential functions of her job as a classroom teacher at any location other than the Crain campus, and VISD was therefore required to reasonably accommodate her by reassigning her to a teaching position at another school.

VISD is correct in its assertion that Preston was not entitled to any accommodation under the ADA because she was not disabled. VISD has also presented evidence that in the more than 26 emails and 6 letters exchanged between Preston and VISD in 2005 and 2006, Preston never stated that she was disabled, mentioned the ADA, or requested a "reasonable accommodation" until after she received the letter from VISD Superintendent Moore stating that he was going to recommend that she be terminated for good cause. (Tr. Vol. II at 24—25, 49—50; Tr. Vol. III at 122—23.) As the Fifth Circuit has observed, "it is the responsibility of the individual with the disability to inform the employer that an accommodation is needed . . . if the employee fails to request an accommodation, the employer cannot be held liable for failing to provide one." *Taylor v. Principal Fin. Group, Inc.*, 93 F.3d 155, 165 (5th Cir. 1996). However, because VISD has provided overwhelming evidence that it nonetheless attempted to respond to Preston's concerns of which it was aware, the Court will explain why VISD's actions were reasonable as a matter of law.[6]

---

[6]. While reasonableness of accommodation is ordinarily an issue of fact for the jury, because the facts and inferences point overwhelmingly in favor of VISD, the Court may find that the accommodations VISD offered Preston were reasonable as a matter of law. *See Bruff v. North Mississippi Health Services, Inc.*, 244 F.3d 495, 503 (5th Cir. 2001).

Although there is some dispute regarding the cause of Preston's PTSD, the uncontroverted evidence shows that VISD attempted to address Preston's complaints regarding both the mold in her classroom and Ms. Torres. Specifically, (1) at Preston's request, Ms. Blundell immediately transferred Preston to a new classroom in a completely different building after Preston discovered mold in her classroom (Tr. Vol. I at 26—27); (2) Mr. Chapa conducted at least three meetings with Preston during February and March 2006, and he allowed Preston to be accompanied by Mr. Guevara at one of these meetings and by her mother at another (Tr. Vol. II at 88—89; Tr. Vol. III at 102, 161); (3) Ms. Blundell instructed Ms. Torres to act professionally and limit her contact with Preston, and she removed Ms. Torres as Preston's appraiser (Tr. Vol. I at 31—33; Tr. Vol. III at 116); (4) VISD offered Preston a position as a special education teacher at the Mitchell Guidance Center (Tr. Vol. II at 46); (5) at Preston's request, Mr. Chapa placed Preston on the transfer list[7] (Tr. Vol. II at 45); and (6) Mr. Chapa contacted Ms. Crick on Preston's behalf regarding an opening in Howell's science department (Tr. Vol. III at 9—11; Dkt. No. 13, Ex. O).

VISD also granted all of Preston's requests for leave, both paid and unpaid (Tr. Vol. I at 56—60 & 74—76), which the Fifth Circuit has found to constitute reasonable accommodation under the ADA. *See Burch v. Coca-Cola Co.*, 119 F.3d 305, 319 n.11 (5th Cir. 1997) (employer's decision to retain employee on suspension with full pay pending investigation into alcohol-related incident was reasonable accommodation of employee's claimed disability of alcoholism where "[o]ther courts have found that *unpaid* leave granted to an employee undergoing treatment can be a reasonable accommodation . . . and that in some circumstances an employer may have no obligation to provide even unpaid leave.") (emphasis in original).

---

7.  Preston testified at the hearing that she did not believe Mr. Chapa placed her on the transfer list (Tr. Vol. III at 79), but has provided no evidence in support of this claim.

However, Preston found fault with each of the above solutions and claims none were reasonable.[8] Instead, when asked what the school could do to help her return to her position, Preston responded that VISD could: (1) conduct a campus-wide survey concerning bullying and harassment; (2) remove Ms. Torres as assistant principal; (3) pay Preston the full remainder of her contract; (4) while Preston was on leave, deduct the cost of a substitute from Ms. Torres' salary; or (5) take no action against Preston's teaching credentials or certification.  (Tr. Vol. I at 124—25.) Messrs. Chapa and Guevara both testified that they did not believe these demands were reasonable or that paying part of Ms. Torres' salary to Preston was even legal. (*Id.*; Tr. Vol. II at 141—42.) The Court agrees and further notes that these are not the types of accommodations contemplated by the ADA. *See* 42 U.S.C. § 12111(9)(b).

One type of accommodation that is contemplated by the ADA is "reassignment to a vacant position," and Preston claims that VISD violated the ADA when it failed to reassign her to a teaching position on a campus other than Crain. Specifically, Preston complains that VISD did not reassign her to the seventh grade science position at Howell and claims that Mr. Chapa "was responsible for blocking the transfer." (Dkt. No. 13 at 8.) However, "[a]n employer is not obligated under the ADA to always provide the employee with best possible accommodations or to accommodate the employee in the specific manner he requested." *Rayha v. United Parcel Service, Inc.*, 940 F.Supp. 1066, 1070 (S.D. Tex. 1996)). Furthermore, as Justice Scalia explained in his dissenting opinion in *Barnett*,

> [T]he phrase "reassignment to a vacant position" . . . envisions elimination of the obstacle of the *current position* (which requires activity that the disabled

---

8.  According to Preston, a transfer to a different building at Crain was not reasonable because Preston believed the entire Crain campus was contaminated by mold (Tr. Vol. III at 93); meeting with Mr. Chapa and other administrators was not reasonable because Preston wanted formal "conflict/resolution" where "basically, you are in a courtroom and you have mediations" (Tr. Vol. II at 62—63); removing Ms. Torres as Preston's appraiser and instructing Ms. Torres to limit her contact with Preston was not reasonable because Preston wanted Ms. Torres fired (Tr. Vol. III at 137); and offering Preston a position as a special education teacher on another campus was not reasonable because the position too stressful (*Id.* at 80—81).

> employee cannot tolerate) when there is an alternate position freely available. If he is qualified for that position, and no one else is seeking it, or no one else who seeks it is better qualified, he *must* be given the position. But "reassignment to a vacant position" does *not* envision the elimination of obstacles to the employee's service in the new position that have nothing to do with his disability—for example, another employee's claim to that position under a seniority system, or another employee's superior qualifications.

*U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 415—16 (2002) (Scalia, J. dissenting) (internal citations omitted). *See also Daugherty v. City of El Paso*, 56 F.3d 695, 700 (5th Cir. 1995) (The ADA does not require "affirmative action in favor of individuals with disabilities, in the sense of requiring that disabled persons be given priority in hiring or reassignment over those who are not disabled. It prohibits employment discrimination against qualified individuals with disabilities, no more and no less.").

VISD has presented evidence that Preston was not offered the position at Howell because she was not certified to teach science at that grade level and because the school was looking for a boys coach to fill that teaching position. (Tr. Vol. II at 10; Dkt. No. 13, Ex. S.) Preston has failed to offer evidence that she was qualified to meet the hiring criteria for the Howell position or any theoretical position to which she could be reassigned, and VISD was not required to create a position to accommodate Preston's alleged disability. *See Foreman v. Babcock & Wilcox Co.*, 117 F.3d 800, 810 (5th Cir. 1997) ("For the accommodation of a reassignment to be reasonable, it is clear that a position must first exist and be vacant. Under the ADA, an employer is not required to give what it does not have."). Thus, VISD did not violate the ADA when it failed to transfer her to a teaching position on another VISD campus.

In sum, even if Preston were able to demonstrate that she was disabled under the ADA, the Court finds that VISD's attempts at accommodation were reasonable as a matter of law.

**B. Preston's Claims that VISD Violated Internal ADA Protocol**

Preston further claims that VISD failed to follow its own local policies in dealing with her alleged disability. This complaint stems from VISD's failure to refer her to its designated ADA coordinator, Barbara Mabray, and failure to open a dialogue with her concerning her rights under the ADA. According to Preston, "The DAA (local) . . . requires VISD to refer employees who may be covered under the ADA to Ms. Mabray." (Dkt. No. 13 at 6.) Thus, when Mr. Chapa granted Preston's request for temporary disability leave—which Preston claims is proof that he considered her to be disabled—he was required to refer Preston to Ms. Mabray regarding her rights under the ADA. His failure to do so, Preston contends, "is a clear violation of policy especially in the light of the supporting documentation from Dr. Constant which clearly diagnosed [her] with the disability of Post Traumatic Stress Disorder." (Dkt. No. 13 at 8.)

The Court first notes that the DAA (local) form offered by Preston does not "require[] VISD to refer employees who may be covered under the ADA to Ms. Mabray," as Preston claims, but instead provides that that "[a]llegations of unlawful discrimination shall be directed to the appropriate coordinator . . . ." (Dkt. No 13, Ex. D.) However, Mr. Chapa testified at the hearing that it was his understanding that he was supposed to refer employees who may be covered under the ADA to Ms. Mabray (Tr. Vol. II at 31), and Preston has offered evidence that no one at Crain referred her to Ms. Mabray regarding her rights under the ADA. (Tr. Vol. I at 44; Tr. Vol. II at 33.) Thus, the question becomes whether Mr. Chapa and other VISD administrators were aware that Preston had a disability that may have been covered by the ADA.

According to Preston's sworn affidavit, "VISD was fully aware of [her] disability as early as January 2006 with the letter from Dr. Constant and through conversations [she] had with . . . Eloy Chapa." (Dkt. No. 13, Ex. C at 3.) Preston further claims that Ms. Jimenez and Ms.

Blundell were aware she was disabled because she "specifically told Ms. Jimenez that the reason for her leave was stress related and connected to the Crain campus," and she also notified Ms. Blundell of her health problems related to stress. (Dkt. No. 13 at 7 (citing Tr. Vol. I at 78); Tr. Vol. I at 37—38.)

Viewing the evidence in the light most favorable to Preston, the Court nonetheless finds that although Preston has presented evidence that she informed VISD she was ill, she has failed to offer any evidence that she informed VISD she was disabled before December 12, 2006. With respect to the letters from Dr. Constant, the Court notes that Dr. Constant did not refer to Preston's PTSD as a "disability," but instead indicated Preston needed to be excused from work for a short time to "recuperate from this illness." (Dkt. No. 13, Exs. J & K.) Moreover, both Ms. Blundell and Ms. Jimenez testified that Preston told them that she needed to take leave due to stress caused by her conflict with Ms. Torres (Tr. Vol. I at 38 & 78), and Preston has failed to offer any evidence that she told either Ms. Blundell or Ms. Jimenez that she was disabled.

Still, Preston points out that Ms. Jimenez received a request for information from Unum Insurance Company regarding a claim for disability insurance submitted by Preston, and further states that "Ms. Jimenez testified that she believed that the granting of the claim indicated that the recipient, Ms. Preston, was disabled." (Tr. Vol. I at 87—89.) Preston has mischaracterized Ms. Jimenez' testimony. Ms. Jimenez actually testified that Preston's Unum policy was an income protection plan Preston had purchased with her own money, and that VISD had nothing to do with the decision to grant a claim under that policy. (Tr. Vol. I at 96—96.) Moreover, when asked by counsel for Preston if it was her understanding that Ms. Preston was granted a disability insurance claim because she had a stress-related disability, Ms. Jimenez responded, "She was granted [disability insurance] due to an illness or sickness." (Tr. Vol. I at 90.)

23

Preston also claims that Mr. Chapa was aware that she had a disability under the ADA based on communications she had sent him. Preston insisted at the hearing that she sent Mr. Chapa one or more emails notifying him of the link between the mold, her fibromyalgia, and PTSD, and that her PTSD rendered her disabled. (Tr. Vol. III at 183—84.) However, Preston was unable to produce the emails "because there are chunks of my email, and I can prove that, that are missing. I believe the district has tampered with my documents. There are very critical areas where I sent emails to the district, and they are missing. I can show you." (Tr. Vol. III at 120—21.) No copies of these emails have been offered as evidence in this case, and Preston has offered no proof that VISD tampered with her email account or these alleged documents.

Nonetheless, Preston claims that because Mr. Chapa granted her request for Temporary Disability Leave, he must have considered her to be disabled. However, Ms. Jimenez testified that VISD policy provides that if an employee is on leave and is unable to return to work at the end of that leave and requests temporary disability leave, the request "shall" be granted. (Jimenez Hearing Testimony, Tr. Vol. I at 90.) Thus, Mr. Chapa had no discretion in the matter, and by granting Preston's request for temporary disability leave, he was not admitting that he regarded her as disabled. On the contrary, Mr. Chapa explicitly stated in his hearing testimony that, based on the information Preston had provided him, it was his belief that Preston did not have a disability under the ADA but instead was experiencing health problems related to stress caused by her conflict with Ms. Torres. (Tr. Vol. II at 44.) Moreover, even if Mr. Chapa was aware that Preston's medical condition precluded her from teaching at Crain, that does not license a reasonable inference that he perceived Preston as generally disabled, thus triggering his responsibility to refer her to Ms. Mabray. *See Windly v. Hightower Oil Co., Inc.*, 91 Fed. App'x. 330, 333 (5th Cir. 2004) (unpublished) (citing *Chandler v. City of Dallas*, 2 F.3d 1385, 1393 (5th

24

Cir. 1993) ("An employer's belief that an employee is unable to perform one task . . . does not establish per se that the employer regards the employee as having a substantial limitation on his ability to work in general.")).

Preston has presented no evidence that she informed VISD that she was disabled or invoked the ADA until her December 12, 2006 emails to Mr. Chapa (Dkt. No. 13, Exs. H & M). Nonetheless, Preston complains that "[e]ven when confronted with Preston's unambiguous and unequivocal assertion of rights under the ADA" in these emails, "rather than enter into a meaningful dialogue with Ms. Preston about a reasonable accommodation, VISD and its Board of Trustees elected to go forward with their termination of Ms. Preston's contract," which was "a clear and egregious violation of [ ] Preston's rights under the American's with Disabilities Act." (Dkt. No. 13 at 14.) However, the Court has already determined that Preston was not disabled under the ADA and was therefore not entitled to an accommodation, but that VISD nonetheless provided Preston with numerous reasonable accommodations for her PTSD. Thus, VISD was not required to engage in any further dialogue with Preston, and it did not violate the ADA when it elected to terminate Preston's contract for cause when she exhausted all leave and was unable to return to work.

Finally, Preston complains that the manner in which VISD calculated her leave is proof of its bad faith and intent to retaliate against her for asserting her rights under the ADA. Although there is some dispute regarding whether Preston's Temporary Disability Leave was to run concurrently or consecutively with her FMLA Leave, both Preston and VISD acknowledge that the policy is ambiguous, and that VISD can decide whether to calculate leave consecutively or concurrently on a case-by-case basis. Running her disability and FMLA leave concurrently and adding state and local leave for the 2006—07 year, Preston would have exhausted all leave

the first week of September 2006. Running her leave consecutively, Preston would have exhausted all leave on December 2, 2006. In either event, there is no doubt that Preston had exhausted all leave as of December 14, 2006, when the Board voted to give Preston notice of intent to terminate her contract. Furthermore, Superintendent Moore notified Preston of his intent to recommend that the Board terminate her contract on December 7, 2006—five days before Preston ever invoked the ADA or made any allegations of discrimination against VISD. Thus, Preston's claim that VISD miscalculated her leave in order to facilitate her termination in retaliation for asserting her rights under the ADA must fail.

## IV. Conclusion

For the foregoing reasons, Defendant VISD's Motion for Summary Judgment (Dkt. No. 9) is **GRANTED**.

It is so **ORDERED**.

**SIGNED** this 12th day of July, 2010.


_____
JOHN D. RAINEY
SENIOR U.S. DISTRICT JUDGE